May it please the Court, Carl Becker on behalf of the appellant Samir Dano and the entities which he represents, which he is the owner or manager of. I've reserved three minutes for your Honor. This is a matter involving national origin discrimination under the Equal Credit Opportunity Act, which is 15 U.S.C. 1691. The facts in this case establish a plethora of actions taken by the defendant, Kelly, which defy common sense and lead to a plausible conclusion that national origin discrimination was involved. Mr. Dano was a former Iraqi citizen, now a citizen of the United States. Samir Dano had borrowed the better part of $13 million from Flagstar Bank and in 2009, with a recession that the Court obviously knows of, Mr. Dano paid them back $10.4 million. He paid them back that, plus to that date he had borrowed a little over $13.5 million and paid back $12 million. So this is not an insubstantial amount. What would he have paid back if the loan had been complied with, principal and interest included? What would have been required? $20 million? $25? Well, it would have required the $12 million that he paid back plus $6.4 million, so it would have been a grand total of $18.4 million. That's if he had completely complied and paid everything back, but there was an agreement. Banks are entitled to have a desire for lending to people that pay the interest and principal, and he did get it restructured. I mean, it's a funny claim given that the bank lends the first time to your client, the client has trouble, they allow the restructuring. All banks, not just this bank, all banks learn about the problems of what's going on after 08. So there's an across-the-board tightening on collateral, I mean, no one can deny that. And to say, I mean, the only evidence you have are two things. The ethnic identity of your client and a belief, but that's it, a belief that people not of that ethnic identity are getting treated better. But this just seems, after Iqbal and Twombly, like that's not a ticket to discovery. Except for the following other facts that arise after he paid them back the $10.4 million. After he paid back the $10.4 million, he then started to pay the obligation under the new recasted agreement, and paid an additional $109,000 in the first year. At that point, he approaches them and says, I'd like an extension of credit or a consideration for that. They say, we have new owners, they won't grant anything, we want you out of our portfolio. He says, why? Is your client behind at that point? Oh no, he was not only paid current, he was ahead $109,000. He was actually overpaid, he overpaid the obligation in the note. But they were going to allow him to comply with the restructured loan. He did comply with it and paid more than that. And I'm just making the point, you know, you said, someone said, we want you out, we don't want your loan anymore. But I'm saying, that's not meaningful when it comes to the restructured loan, because no one's saying the bank wasn't going to let him perform under the restructured loan. I agree. It sounded pretty easy if he was so far ahead of it. After he complied with the restructured loan, and the bank never said he didn't at this point comply with the restructured loan, he asked for an application for credit. Now this is critical to this case, because the application for credit under 15 U.S.C. 1691 D1 through D2 provides that if you make an application for credit, then as a matter of law and congressional intent, the creditor has to give a reason why they won't do business with the borrower. And they absolutely refused to give him the application. After, he's already said, I don't understand what's going on here. I believe that you've racially discriminated as to me. And they say, I'm not telling you why we did anything. They don't respond like a normal common sense expression would be. We didn't discriminate against you. Make an application, we'll show you. In fact, we'll tell you why we're not giving this loan. He says, I believe you're discriminating against me based upon my race. Does he say what facts support his belief? Yes. What are those facts? He says, I'm overpaid. I've paid more than I have. I'm offering you another $6.3 million. That all goes to, this is unfair. How does that show that the unfairness is based on his race? The case of, well, as it was pointed out in Hood v. Midwest Savings, racial discrimination in a commercial setting is never overt. They're not going to come out and say to you, we're not giving you this loan because you're racially, because we don't like Iraqis. We know for a fact, and we pointed it out at the trial level, that you need something, I mean some evidence or some evidence, either direct evidence or some evidence from which it's reasonable to infer from that evidence that the basis is racial discrimination as opposed to something else. And you go to trial, we don't allow juries to just speculate. They have to have a basis for a verdict, and that's the plaintiff's burden of proof. And I'm just saying, what do you have other than his subjective belief that they must have been doing this because of my race? I mean, is there anything else there? The only things that I can only point out to this court are a whole set of facts that all mesh together. Yeah, they're treating this guy, well you're arguing they're treating him badly, but what, you know, okay, they're treating him because he's a man, he's a woman, he's, his race, his, you know, it doesn't, I understand what you're saying. On the other hand, I don't have access to their records. I can't, I can't do anything other than initiate a suit. I begged them at a meeting, please give me an application so you can show me why you're not discriminating against us, against Mr. Dano on national origin. If they had given us the application, then they would have given us a reason for their refusal. You said that one of these statutes, I think a federal statute, requires them to give a reason? Yes. Which statute, does that allow you to bring a claim under the statute against a bank and say, listen, they're supposed to give me a reason, they won't. Why would that have been an avenue? There's no, that's exactly what the district court, Judge Duggan, said. Okay, so why was that wrong? Judge Duggan said, and he's correct, that refusing to give an application, Congress must have made an error, refusing to give the application, does not trigger a cause of action. Once you give the application, then you must give a reason and a motivation, and that does trigger a cause of action. But there's no cause of action triggered, and that's the footnote found on page 10 of Judge Duggan's opinion, that they can say, I'm not giving you an application, and there's no way to take it any further under the act. Whereas once they say, I'll accept your application, they've got to tell me why. When we asked for this application, common sense and judicial experience would have expected, either they would say, here, have the application and we'll review it, or the alternative would have been, we're not, I said, Mr. Dano said, we can't figure out why you're doing this other than because he's Iraqi, and they don't say anything in response. Now the new owners, this is not the same people who loaned him the money. The people who loaned him the money originally was the Hammond family of Michigan. The people who rejected even giving an application were the new controlling entity, which is Madeline Patterson Hedge Fund from New York. They refused it. They're the ones in control. So one thing that Iqbal and Twombly say is, you have to think of possible alternative explanations. So I get your point that you don't have access to their records. I get your point that it's often people don't usually, in doing something, say this is because of religious-based or ethnic-based, so I get all that stuff. But why aren't you hurt here by this Iqbal Twombly point? I mean, there are some really obvious common-sense explanations for what happened that have nothing to do with race that he'd applied for. This exact individual had gotten the loan he wanted. He couldn't perform it without a restructuring. That's, you know, strike one. They then restructure it. Again, same individual, same racial identity. Throughout this time, you've got this massive real estate crisis, and then they say the next time he wants to restructure, no. I mean, I just can't think of too many human beings that wouldn't jump to the explanation, once burned, twice shy. We've got to tighten up what we're doing here. And then what you have on the other side is a belief. They never said anything. That's the point. They didn't say, well, we're not going to make this loan because our belt's been tightened up. They never said, we're not going to make this loan because we have a limited amount of money available. They never said any of that. Don't you think that's a common-sense explanation? Well, it's a good explanation, except for Igbal and the Sixth Circuit's decision in Watson v. Mohawk Industries says, often defendants' conduct has several plausible explanations. Faring out the most likely reason for the defendants' actions is not appropriate at the pleading stage. I think that's right. And I think the trick with Twombly and Igbal is what do you do when one possibility just seems so self-evidently true, and the other one is just utterly, utterly speculative. I thought that's what they were saying. Now, you may say, in your case, it's not utterly, utterly speculative. I get that, but I'm just telling you, I thought that was their point. Well, if I had any discovery at all in this case, I would find out if they made any loans during that period of time, irrespective of to whom it was made. It seems unlikely since there are advertisements in the paper every day in Detroit that Flagstaff is making loans. And it isn't like this client, he doesn't owe anybody anything. He's paid them $12.5 million. He's offering them $6.3 million in unencumbered assets. Remind me what the record shows as to what did happen to the restructured loan. It's still being performed? Yes. So the restructured loan, Mr. Danow sold a piece of property. He received $27 million on the sale. And then paid it off. And paid off $10.5 million, which included paying off a house loan of $2 million and left him owing $6.4 million in total to be paid in installments over a three-year period. And in the first year, this is all in the pleadings, and in the first year he not only paid what he was supposed to pay, he paid an additional $109,000 over and above what they asked him to pay. During this period of time... I just want a quicker answer. Oh, I'm sorry. The quicker answer was this restructured loan fully performed. It is not fully performed. Okay, that's all I want to know. At the time that it stopped was because the defendant, Appley, was making demands of five different amounts that were claimed to be owing, and Mr. Danow and myself attempted every single time to try and get to the amount. It was impossible. The common sense explanation turned out to be true. The common sense fear turned out to be confirmed. They were in such serious breach, they themselves... This is a bank, Your Honor. A bank calculating damages, calculating what was owed, made five different statements in two months about what was owed, making it impossible for Mr. Danow to go to anybody else and tell them what was owed and get a loan because they had notified him that he was in default when he was current and above paid. I pointed out in the brief that we had paid every single amount and the bank notified us with six months to go on the loan. Before then, the bank says we made an error. We made a total error in our calculations and we were off by $200,000. I said, that's crazy. Next, they come back and say it was $113,000, but one day later they send a bill for $161,000, then they send a bill for $170,000, and then a bill for $174,000. We were tortured by this. This is all part of what I say is nonsense. It didn't make any sense. Put all these facts together. It looks like I'm seriously out of it. Yeah, if you want to continue, you'll have to take some time. I'd like to continue just to finish off the thought. How much time would you like to take from the rebuttal time? You have three minutes. I'll take another minute. All right, and you'll have two minutes for rebuttal. I just want to say, we add the request, we add the proposal, we take this incredible five times error in two months that they have never to this date corrected. We have a personal confrontation, a change of ownership from Michigan control to New York control, and finally the client in desperation says, why are you doing this to me? I think you're racially motivated. And instead of normal common sense saying, that's not true, make an application, or we'll tell you why we didn't do it. They do nothing. Not one common sense act during this entire time. I would agree standing alone on any single thing may not do it, but when you put it all together, it's hard to believe that there isn't at least a plausible claim for national origin discrimination. Thank you. Thank you. May it please the court. John Adam Barrett on behalf of the Appley Flagstar Bank. Taking this as a 12B6 motion, I just wanted to respond to Judge Sutton's point, which is ultimately, although not relevant to the pleadings, the restructured loan was not complied with, and we've had to sue in state court now to enforce that loan. So to make sure the record is clear on that point, I heard a lot from Mr. Becker, and I wanted to make sure that that was, so that's a public pleading somewhere. It is, Your Honor. Ultimately, I think the court has identified what the issues are here, and those are the all Twombly, as well as the Keyes decision from this court here on how to view a pleading in light of Rule 8 and the Supreme Court's explanation that we need to see whether or not a claim can be nudged from conceivability to plausibility. Judge, just to be clear, when this restructured loan was not being complied with and plaintiff was asking for another restructuring or whatever, was the request being made, the noncompliance was going on at the time that they wanted to restructure the second time? Is that it or no? No, that's a key point, Your Honor, and let me clarify. When this issue arose, Flagstar discovered an error in its computer billing on the interest. That's brief, and that's also noted in the pleading. The note, however, was not declared to be in default, was not accelerated, demand was not made at that time. So as those issues are going on, Mr. Danu, on behalf of his entities, is saying, hey, just around the bend, if this loan's going to come due, I'd like a second bite at the apple or a second chance to restructure this deal. What say you, Bank? And Bank, at that time, as set forth in the pleadings, responded, we are not interested in refinancing this a second time. We would like to be paid and want to honor or require compliance with the contractual terms. And I think that's the point that Judge Duggan makes in his opinion. Ultimately, if we look at the allegations here, what they boil down to is you had no problem with Iraqis when you made the loan. You had no problem with Iraqis when you extended the loan and helped refinance and released property. But for some reason, now you have a problem with Iraqis. And that's what the allegation is. And the Twombly and Ichabod cases ultimately say that we need to allow the court to look, draw upon its judicial experience and common sense in reviewing those pleadings. Now, before the Twombly decision, would this have stated a claim upon which relief could be granted? I don't think so, Your Honor, because if you look even under that setup, it always has required a plain and short statement and has always required... There was always notice pleading before, wasn't there? Notice pleading, but notice to what event? The ultimate, the only conclusion here of racial discrimination in the complaint appears in paragraphs 34 and 35, and they're preceded by the phrase, upon information and belief. And so what ultimately they're saying is we don't know what the conclusion is, why you're requiring compliance with the contractual terms, but we suspect. And that's what Judge Duggan, I think following along the Ichabod and Twombly line, said, what you want is the court to give you the power of discovery to go ahead and feed your fishing expedition. The same allegations... Which is kind of what we used to do. I mean, you know, it used to be that, you flush this out later in discovery and prove your case later, but the ballgame's been changed. Perhaps it has, Your Honor, but the point is you could have said I don't like blue shirts or I don't like white shirts, or whatever reason you want to use, plaintiff alleges on information and belief and now wants discovery to prove it. And the Twombly case says in an antitrust context, which I think applies here in a racial discrimination case, which potentially would include hundreds of loan applications, these cases are expensive, discovery is expensive, it can be a distraction from business, and so we now have to act as somewhat of a gatekeeper here to look at these allegations to see if we have moved the ball or nudged it across the line. And that's clearly what's not happened here. Let me ask you this. The bank's communication with the plaintiff, did the plaintiff ever mention any non-Iraqi or Argentine people who were customers of the bank who were better treated than he was? He did not, Your Honor. In no time, nor is it alleged in the complaint, that he said, I know of other instances where this has occurred. He just said like what you heard the counsel say this morning. I hear you on the radio advertising for loans, so you must be applying for loans or allowing loans for non-Iraqis. Now, what's interesting here is the idea of we had a loan. We are in contractual compliance right now, and the hallmark of Michigan law, like many state laws, is that parties are entitled to enforce the contracts before them. What plaintiffs or appellants would like to argue here is that by enforcing a contract, you somehow must be motivated by a discriminatory basis if you don't agree to my terms. So to make that claim work, he would need to show Judge Clay exactly what you're saying. Seven other Caucasian or non-minority applicants applied for a second go-around or a second extension, and you gave it to them. Why am I different? And then we would be in a different situation. But what he wants to do again is to start his own claim to find those instances and to move forward along those lines. Can you explain a little bit about this application process, that if they give out an application and then deny it, they have to give a reason? However, if they don't give the application, they don't have to give a reason at all? Well, that's the irony here. At no point during these communications in which I was involved on behalf of the bank did I ever see an application being requested. And no one, as a lawyer who does extensive banking workup, have I ever seen in a refinance... I mean, that's discrimination by refusing to do business with somebody because of their race, right? To the extent that he was asking for it and the motivation was race, it is discrimination. But the point is that we were already in a contract with him. We were already having... I already extended to him credit and now it's coming up. For him or any other loan applicant or any other existing borrower, I want to extend, and if you don't let me extend, it's somehow because of my race. That's where we have slipped the line. That's where the common sense has to, I think, to apply. I do not see... In this case, the lack of an application... I mean, this doesn't point in either direction, in non- or pro-discrimination. But part of his complaint is the bank had already communicated to him enough is enough. So, of course they didn't give him an application. I thought that was his complaint. And so, no, I don't think that necessarily helps you because that just takes you back to that decision. I mean, so, you know... It is true, though, if you're not getting out applications to people of a certain race, I would think you'd have a pretty serious problem. But in this case, that's question-begging because obviously they were doing business with him and they... The reasons that maybe they're clear, maybe they aren't, had already decided no more business with you. And so the fact they wouldn't give him an application follows from that statement, if that's true, which I guess we have to assume in the complaint. That's why I think I'm hamstrung. Because I can't... The facts are what he has pled. I can't change those facts for argument here and tell you that's not what happened or didn't happen. It's what he's put in the complaint. And my argument today is that that in its totality does not amount to racial discrimination without more, without some additional facts to support that. And I think the district court judge laid out what those types of facts... What's your best take on this standard of alternative explanations? So it can't be the rule that you dismiss on Rule 12b-6 just because the defendant has an alternative innocent explanation for their conduct, right? I mean, because that is the point of discovery. You have a theory and then you test it with the evidence and you figure out, maybe eventually to a jury, which explanation's right. So it can't be that you win if there's an innocent alternative explanation. So how would you characterize the tipping point? Because clearly that phrase, alternative explanation, is part of it baltwombly, and what I'm having a hard time getting my hands on is how to describe that tipping point. The tipping point, Your Honor, I think is a valid argument and it's the idea of how far do we move the ball here until we cross the magic line. And I think what it baltwombly tells us or teaches us as it relates to this case is you cannot have your quintessential fact be upon information and belief. If you're trying to tie it back to racial discrimination, sex discrimination, age discrimination, what have you, you need something more. And I think if we look at those cases in the context of the Keys case, which we have cited in our papers before the Court, in that case, the... Something more could have been, let's just try to figure this, could have been comments, a racist comment. Right, I applied, other people in my job were being promoted, I wasn't, I was being supervised in an on and off matter. I mean, those are the things we saw in the Keys case and those are exactly the kinds of things that we do not see here in the complaint. Instead, we see things that have a positive or have, through common sense, an alternate explanation that does not pass the judicial smell test, which I think now district court judges must make under the Iqbal and Twombly setup. I'll yield my time back to the Court unless there's any other questions for me. Thank you very much. I'd just like to clarify the record here. We are the ones who started the lawsuit in the state court. We're the ones who asked for declaratory relief after we couldn't find out what we owed. We're the ones who claimed that they were charging late fees on a note that didn't permit late fees. We tried to clarify this. They then countersued, I'm sorry, they then filed a separate action and never, ever sued the borrower. To this date, the borrower has never been sued. Just out of curiosity, was that lawsuit started before or after the bank initially declined to do the second refinancing? The lawsuit was started after a meeting in which resulted in the bank declining the initial, declining to grant a credit, and after the bank made claims that we were delinquent when we were overpaid. So sometime in June of 2012 is when the lawsuit was started. That lawsuit then went to this court on a removal. The court, the district court, then remanded the state court proceedings other than the Equal Credit Opportunity Act and we're back in both state court and here. You probably don't do any employment law. Do you do employment law at all? I do though. Okay. Because the analogy to this case that I'm trying to work through and just generate a response, don't worry, is if you had, let's say, your client work for the bank and let's say your client broke a rule in the bank and the bank fires your client. In this instance, there's an explanation. They say the reason we did this is because you broke this rule. But your client says, I don't believe that. Now, your client doesn't have any evidence of discriminatory remarks, direct evidence of discriminatory intent. But the way your client might be able to still get discovery into a jury is by showing that when other non-Iraqi employees broke this rule, they weren't fired. So that would be the way you have to go to get anywhere with that case. And I guess my thinking is that case, I know it's not yours, this case, but it seems a little close. I can't imagine the plaintiff not having to identify some of those similarly situated non-Iraqi employees. That seems to me like a legitimate requirement in the complaint stage. Other than running around and literally going door to door when I don't know anybody, unlike in an employment case where the employee knows the people he works with. Okay, that's a fair point. And I just wanted to add one item, and I'll be done, which is in Watson, the turning point, so to speak. The court said, oh, hell, that the plaintiff can proceed even if it strikes a savvy judge that actual proof of facts is improbable and that a recovery is very remote and unlikely that does not necessarily have anything to do with determining plausibility. And that was quoted from Iqbal. Thank you. Thank you very much. The case is submitted. We now adjourn court.